## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LEILANI EMERICK,**

      **Plaintiff,**

      **v.**                               **Civ. No. 22-622 JFR/KK**

**BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF BERNALILLO,
CHARLEEN MCNEELY,** *now known as*
*Charlene Ramirez,* **in her individual and representative**
**capacity,** and **PATRIZE ARCHULETA** *in her individual*
**and representative capacity,**

      **Defendants.**


### MEMORANDUM OPINION AND ORDER[1]

    **BEFORE THE COURT** are the parties' competing motions for summary judgment:

*Defendants' Motion for Summary Judgment on Basis of Qualified Immunity and Other Grounds*

(Doc. 20) ("Defendants' Motion") and *Plaintiff's Cross-motion for Summary Judgment* (Doc.

22) ("Plaintiff's Motion") (collectively, "Motions").[2]  The Court ordered supplemental briefing

on March 30, 2023 (Doc. 39), and the parties submitted their supplemental briefs on April 13,

2013 (Docs. 41, 42).  The Court held a hearing on the Motions on April 27, 2023.  Docs. 38, 43.

Having reviewed the parties' briefs and conducted the hearing, and being otherwise sufficiently

advised in the premises, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants'

Motion, and **DENIES** Plaintiff's Motion.

---

[1]     Pursuant to 28 U.S.C. § 636(c) and Fed R. Civ. P. 73(b), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment in this case.  Docs. 6, 9, 10.

[2]     Discovery in this case has been stayed pending resolution of Defendants' Motion.  Doc. 40.

# I. BACKGROUND

Plaintiff, a recipient of low-incoming housing assistance under 42 U.S.C. § 1437f, commonly known as "Section 8" assistance, filed an *Amended Complaint by Section 8 Beneficiary for Damages Due to Underpaid Housing Subsidy* ("Complaint") on July 18, 2022, in the Second Judicial District Court in Bernalillo County, New Mexico.  Doc. 1-2 at 1-2.  Therein, Plaintiff brings three claims pursuant to 42 U.S.C. § 1983.  Doc. 1-2 at 1.  First, Plaintiff alleges that Defendants Board of County Commissioners of the County of Bernalillo[3] ("Bernalillo County"), Charleen McNeely,[4] and Patrize Archuleta violated 42 U.S.C. § 1437f by depriving her of part of her rent subsidy ("Count 1").  Doc. 1-2 at 7-9.  Next, Plaintiff alleges that Defendants BCHD, McNeely, and Archuleta violated 42 U.S.C. § 1437f by depriving her of the full benefit of her utility allowance ("Count 2").  Doc. 1-2 at 9-10.  Lastly, Plaintiff alleges that Defendants BCHD and McNeely violated her Fourteenth Amendment Due Process Rights because they did not give her adequate notice before decreasing her Section 8 benefits ("Count 3").  Doc. 1-2 at 10.  Defendants removed the case to this Court on August 19, 2022, invoking this Court's federal-question jurisdiction.  Doc. 1.  The factual basis giving rise to Plaintiff's claims is set forth more fully below in Part II.B, *infra*.

# II. ANALYSIS

## A.    Summary Judgment Standard

A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine

---

[3]        Bernalillo County Housing Department ("BCHD") is a division of the County of Bernalillo, New Mexico.  Thus, to the extent the Court's analysis references BCHD, such reference is tied to Defendant Board of County Commissioners of the County of Bernalillo as the named Defendant in this case.

[4]        Defendant Charleen [sic] McNeely is now known as Charlene Ramirez, as reflected on the case caption.  Doc. 46.  For purpose of simplicity, she is referred to as Defendant McNeely.

dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case.  Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Whitehead v. Mgmt. & Training Corp.*, 524 F. Supp. 3d 1155, 1166 (D.N.M. 2021) (internal quotation marks and citations omitted).  "A dispute is genuine if there's enough evidence on each side that a rational trier of fact could resolve the issue either way." *Rose ex rel. Rose v. Brown*, 14 F.4th 1129, 1138 (10th Cir. 2021).  A showing that "no genuine issue as to any material fact" exists is made through "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003) (internal quotation marks and citation omitted).  The Court makes reasonable inferences and construes all facts in favor of the nonmoving party. *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1108 (10th Cir. 2002).  But the Court will not weigh evidence or decide issues of credibility. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986).

"Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  When considering cross-motions for summary judgment, the Court may "assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks and citation omitted).

**B.      Material Facts**

The following facts are taken from the parties' briefs and supported by evidence in the record and/or the federal law and regulations[5] that govern the issues material to the resolution of the parties' Motions.

1.      42 U.S.C. § 1437f ("Low-income housing assistance"), or Section 8 of the Housing Act of 1937, authorizes the payment of rental housing assistance to private landlords on behalf of low-income households.  Doc. 20-1 at 1.

2.      Plaintiff has participated in Section 8 assistance since August 10, 2016.  Docs. 20-1 at 1; 20-2 at 1; 20-3 at 1.

3.      BCHD is a public housing agency ("PHA").  Docs. 20-1 at 1; 20-2 at 1; 20-3 at 1.

4.      Pursuant to Section 8, and as apportioned by federal guidelines, BCHD pays a portion of Plaintiff's rent for her housing unit, and Plaintiff is responsible for the remaining amount.  Doc. 20-1 at 1.

5.      A Housing Assistance Payment ("HAP") Contract is a contract between BCHD and a landlord participating in Section 8 housing.  An individual participating in Section 8 housing is not a party to such contract.  Doc. 20-1 at 2.

6.      BCHD's payments to landlords are termed "HAP payments."  Doc. 20-1 at 2.

7.      During Plaintiff's time renting a housing unit from John Judkins, her landlord, there was a single HAP Contract between Mr. Jenkins and BCHD, signed on August 10, 2016.  Doc. 20-1 at 2; *see* Doc. 20-4 at 1-3.

---

[5]      Though the parties appear to agree about the federal regulations that are relevant to this case, there is some disagreement concerning interpretation of these regulations.  *See, e.g.*, Doc. 21 at 3.  For this reason, the Court quotes all federal regulations directly from the Code of Federal Regulations.

8.      24 C.F.R. § 982.4(b) defines "[r]ent to owner" as "[t]he total monthly rent payable to the owner under the lease for the unit.  Rent to owner covers payment for any housing services, maintenance and utilities that the owner is required to provide and pay for."  It defines "[g]ross rent" as "[t]he sum of the rent to owner plus any utility allowance."  Doc. 22 at 1.

9.      Plaintiff rented a one-bedroom unit from Mr. Judkins for which she paid the electric and gas bills.  Docs. 20-4 at 3; 22 at 2; 22-11 at 3.

10.     Plaintiff's monthly rent for her Section 8 housing unit was $714.00, with utilities payable by Plaintiff, except for water, sewer, and garbage.  Docs. 20-1 at 2; 20-4 at 2-3.

11.     BCHD was not a contractual party to the lease agreement between Plaintiff and Mr. Judkins.  *See* Doc. 31-1.

12.     The United States Department of Housing and Urban Development ("HUD") annually updates Fair Market Rents ("FMRs") which are used to set a reasonable payment standard for PHA payments to those participating in the Section 8 Housing Choice Voucher ("HCV") program.  Docs. 20-1 at 2; 20-2 at 2; 20-3 at 1-2.

13.     24 C.F.R. § 982.505(a) defines "payment standard" as "the maximum monthly subsidy payment," which "is used to calculate the monthly housing assistance payment for a family."  *See* Docs. 20-1 at 2; 20-2 at 2; 20-3 at 2.

14.     HUD publishes FMRs for each market area nationally.  As a PHA, BCHD is required to adopt a payment standard schedule that sets voucher payment standard amounts for each FMR area within its jurisdiction.  *See* Docs. 20-1 at 2; 20-2 at 2; 20-3 at 2.

15.     24 C.F.R. § 982.54(a), (c) require BCHD, as a PHA, to "adopt a written administrative plan that establishes local policies for administration of the [Section 8] program in accordance with HUD requirements.  The administrative plan and any revisions of the plan must

be formally adopted by the PHA Board of Commissioners or other authorized PHA officials. The administrative plan states PHA policy on matters for which the PHA has discretion to establish local policies. . . . The PHA must administer the program in accordance with the PHA administrative plan." Doc. 22 at 2.

16.     24 C.F.R. § 982.503(a)(2) states: "The payment standard amounts on the PHA schedule are used to calculate the monthly housing assistance payment for a family." *See* Doc. 20-1 at 3.

17.     24 C.F.R. § 982.1(a)(3) provides, in relevant part, that when rent for a Section 8 housing unit "is less than the payment standard, the family generally pays 30 percent of adjusted monthly income for rent.  If rent is more than the payment standard, the family pays a larger share of the rent." Doc. 22 at 2.

18.     BCHD listed rent approximations using payments standards and utility allowances to determine a Section 8 tenant's contract rent.  Doc. 22-4.

19.     42 U.S.C. § 1437f(o)(2)(A)-(B) set forth how a Section 8 participant's assistance payment shall be calculated.  These provisions contemplate whether a Section 8 participant's rent plus tenant-paid utilities exceeds the applicable payment standard.  Doc. 22 at 2.

20.     BCHD listed the following FMRs/payment standards for a one-bedroom unit with utilities included: $767.00 effective January 1, 2016; $716.00 effective January 1, 2017; $707.00 or $716.00 effective January 1, 2018; $711.00 effective January 1, 2019; $713.00 effective January 1, 2020; $770.00 effective January 1, 2021.  Docs. 22 at 2; 22-5; *see also* Doc.22-6.

21.     24 C.F.R. § 982.505(b) requires BCHD, as a PHA, to "pay a monthly housing assistance payment on behalf of the family that is equal to the *lower* of: (1) The payment

6

standard for the family minus the total tenant payment; or (2) The gross rent minus the total

tenant payment." (Emphasis in original).  *See* Doc. 20-1 at 3.

22.     24 C.F.R. § 982.505(c)(3) provides: "If the amount on the payment standard

schedule is decreased during the term of the HAP contract, the PHA is not required to reduce the

payment standard amount used to calculate the subsidy for the families under HAP contract for

as long as the HAP contract remains in effect."  Doc. 22 at 3.

23.     24 C.F.R. § 982.505(c)(3)(i), (iii) provide: "If the PHA chooses to reduce the

payment standard for the families currently under HAP contract during the HAP contract term in

accordance with their administrative plan, the initial reduction to the payment standard amount

used to calculate the monthly housing assistance payment for the family may not be applied any

earlier than the effective date of the family's second regular reexamination following the

effective date of the decrease in the payment standard amount. . . . The PHA must provide the

family with at least 12 months' notice that the payment standard is being reduced during the term

of the HAP contract before the effective date of the change."  Doc. 22 at 3.

24.     24 C.F.R. § 982.505(c)(4) provides: "If the payment standard amount is increased

during the term of the HAP contract, the increased payment standard amount shall be used to

calculate the monthly housing assistance payment for the family beginning at the effective date

of the family's first regular reexamination on or after the effective date of the increase in the

payment standard amount."  *See* Docs. 20-1 at 3; 20-2 at 2; 20-3 at 2.

25.     From 2018-2020, BCHD's Administrative Plan included the policy that BCHD

would not apply a decreased payment standard as long as the same HAP contract remained in

effect.  Docs. 22-7 at 2-3; 22-8 at 2-3; 22-9 at 2-3.

26.    The HUD New Mexico field office contacted BCHD in August 2018 regarding contact Plaintiff initiated with HUD.  Doc. 20-1 at 3.

27.    Plaintiff contacted HUD regarding the FMRs and an increase in her portion of the rent for her Section 8 housing.  Docs. 20-1 at 3; 42-3 at 2.

28.    BCHD revised the rental calculation after it was contacted by HUD, resulting in Plaintiff's portion of the rent for her Section 8 housing reverting to $162.00 per month.  Doc. 20-1 at 3-4.; *see* Doc. 42-3 at 2.  *Compare* Doc. 20-5, *with* Doc. 20-6.

29.    Recertification of Section 8 participants is required at least annually.  Docs. 20-2 at 3; 20-3 at 3.

30.     At Plaintiff's annual recertification in 2019, her portion of her rent for her Section 8 housing was increased.  Docs. 20-1 at 4; 20-2 at 3; 20-7.

31.    Plaintiff was informed of this increase by an "Assistance Change Letter" dated July 9, 2019.  Docs. 20-1 at 4; 20-2 at 3; 20-7.

32.    The July 9, 2019 "Assistance Change Letter" stated that Plaintiff's portion of her rent for her Section 8 housing would increase from $162.00 per month to $224.00 per month, with a corresponding decrease in the monthly HAP payment to her landlord, effective September 1, 2019.  Doc. 20-1 at 4.  *Compare* Doc. 20-6, *with* Doc. 20-7.

33.    At Plaintiff's annual recertification in 2020, her portion of her rent for her Section 8 housing was increased.  Docs. 20-1 at 4; 20-2 at 3; 20-8.

34.    Plaintiff was informed of this increase by an "Assistance Change Letter" dated July 20, 2020.  Docs. 20-1 at 4; 20-2 at 3; 20-8.

35.    The July 20, 2020 "Assistance Change Letter" stated that Plaintiff's portion of her rent for her Section 8 housing would increase from $ 224.00 per month to $226.00 per month,

with a corresponding decrease in the monthly HAP payment to her landlord, effective September 1, 2020.  Doc. 20-1 at 4.  *Compare* Doc. 20-7, *with* Doc. 20-8.

36.     A Section 8 participant can request a review of income, but cannot challenge the payment standards.  Doc. 20-3 at 2.

37.      Plaintiff's counsel contacted Defendant Archuleta in or around December 2021 via e-mail.  Therein, he requested that BCHD adjust Plaintiff's subsidy amount. Plaintiff's counsel claimed that Plaintiff should be compensated because her subsidy was underpaid in 2019 and 2020.  Doc. 20-3 at 3.

38.     Defendant Archuleta did not offer a response directly to Plaintiff's counsel's assertion made in his e-mail.  She did, however, provide him with documents from Plaintiff's file requested under a release of information that Plaintiff executed.  *Id.*

39.     In 2021, BCHD's Administrative Plan required it to promptly remedy subsidy underpayments upon learning of them and reimburse tenants for subsidy underpayments.  Doc. 22-10 at 2-3.

40.     Defendant Archuleta was employed as a Section 8 Housing Support Program Supervisor and did not make or create the policies contained in BCHD Administrative Plans in that role.  Doc. 20-3 at 3.

41.     Defendant McNeely was employed as a Section 8 Housing Support Specialist and did not make or create the policies contained in BCHD Administrative Plans in that role.  Doc. 20-2 at 3.

C.    **Defendants' Motion**

Defendants' Motion is primarily rooted in the defense of qualified immunity.  Defendants McNeely and Archuleta argue that they "were only carrying out their respective job duties related to Plaintiff's Section 8 status in accordance with HUD's mandatory regulations related to increases in payment standards."  Doc. 20 at 14.  They assert, therefore, that they "meet the very definition of government officials performing their discretionary job function."  *Id.*  They further assert that "the law was not clearly established regarding Plaintiff's claims of alleged constitutional violations."  *Id.*  Additionally, Defendant Archuleta contends that, as a supervisor, she cannot be held liable in this case because she "did not personally participate in the factual issues and conduct alleged by Plaintiff."  *Id.* at 15-16.

BCHD disclaims liability on the basis that, in its view, "there are no unconstitutional or illegal BCHD policies" and "Plaintiff does not specify the alleged unconstitutional or illegal Bernalillo County policy" in the Complaint.  *Id.* at 17.  BCHD further asserts that "Plaintiff cannot claim illegality or unconstitutionality arising from Bernalillo County's implementation of HUD regulations on increases in payment standards" and claims that "it is undisputed that individual Defendants McNealy and Archuleta were not decisionmakers concerning policies."  *Id.*

Plaintiff responds to Defendants' Motion by arguing that qualified immunity is not available to Defendants McNeely and Archuleta because they have conceded that the acts they performed were undertaken without any discretion.  Doc. 23 at 12-13.  Plaintiff contends that, even if the individual Defendants were acting with discretion, "the applicable law establishing Plaintiff's constitutional property interest and statutory right to her Section 8 benefits [was] sufficiently well-established when the relevant facts of the case took place."  *Id.* at 14.  Plaintiff

further contends that Defendant Archuleta, as a supervisor, "was obligated to act to ensure Defendant [BCHD] complied with its obligation to reimburse Plaintiff," and that while she acknowledges she was aware of Plaintiff's claims, she failed to take action. *Id.* at 11.

As to BCHD, Plaintiff argues that it has "effectively concede[d]" that it had a policy, practice, or custom in place at the time of the events in issue that give rise to municipal liability. *Id.* at 5. Plaintiff further argues that there is "a direct link between the policy or custom and . . . Plaintiff's injury." *Id.* Specifically, according to Plaintiff, BCHD adhered to a policy that "violated Plaintiff's federal rights under the Fourteenth Amendment and under federal statute." *Id.* at 6. Plaintiff asserts that BCHD misapplied HUD regulations, and that acceptance of the reading of such regulations by Defendant BCHD produces an absurd result that is contrary to the purpose of the regulations. *Id.* at 6-7.

Defendants McNeely and Archuleta reply to Plaintiff by arguing that she "never identifies the specific violation of a constitutional or statutory right" she claims was committed. Doc. 27 at 5. Rather, according to Defendants McNeely and Archuleta, Plaintiff only alleges that they "misapplied HUD regulations." *Id.* They further assert that Plaintiff does not refute their position that they "were only carrying out their respective job duties." *Id.* All of this, according to Defendants McNeely and Archuleta, allows them to avail themselves to the qualified-immunity defense. *Id.* Moreover, Defendants claim that, in her response, Plaintiff fails to address her claim that Defendants deprived her of a utility allowance. *Id.* at 6. They additionally contend that "[t]he issue of payment of utilities was solely between Plaintiff and her landlord[,] John Judkins, as set forth in their executed lease agreement," to which "BCHD was not a party." *Id.*

**D.      Plaintiff's Motion**

In her Motion, Plaintiff posits that she has "a constitutionally protected property interest in receiving the correct amount of Section 8 benefits," and that Defendants "deprived her of this right without due process of law, in violation of the Fourteenth Amendment."  Doc. 22 at 3. Specifically, according to Plaintiff, Defendants gave her insufficient notice "before taking away part of her Section 8 benefits."  *Id.* at 7.  Plaintiff further argues that she "has a protected statutory right to receive the correct amount of housing benefits and a properly calculated utility allowance."  *Id.* at 9.  She claims that this right was violated by Defendants because they did not follow the applicable regulations before applying a decreased payment standard to her Section 8 assistance payment and did not correct subsidy underpayments.  *Id.* at 11, 13.

Defendants respond to Plaintiff's Motion by arguing that Plaintiff "misconstrues the distinction between *increases* in HUD payment standards and *decreases* in HUD payment standards."  Doc. 31 at 9 (emphases in original).  Defendants further state that, in her Motion, Plaintiff does not "address[] her claims against individual Defendants McNeely and Archuleta" which, in their view, bolsters Defendants McNeely and Archuleta's position that they are entitled to qualified immunity.  *Id.* at 10.  Defendants reiterate their early argument that "the issue of who pays the utilities is governed by Plaintiff's lease agreement with her landlord, to which BCHD was not a contractual party."  *Id.* (internal quotation marks omitted).

Plaintiff replies by stating that Defendants' construction of the HUD regulations is incorrect.  Doc. 34 at 5.  Even still, according to Plaintiff, "Defendants' action had the effect of reducing the applied payment standard, and consequently reducing Plaintiff's Section 8 benefits and increasing her out of pocket housing costs."  *Id.* at 6.  Plaintiff again challenges Defendants' reading of HUD regulations.  *Id.* Plaintiff also argues that Defendants fail to demonstrate that

they provided Plaintiff proper notice that her Section 8 benefits would be reduced.  *Id.* at 8-10.

Plaintiff also refutes Defendants' claim that she did not address her claims against Defendants

McNeely and Archuleta in her Motion, and notes that her response to Defendants' Motion

includes argument concerning qualified immunity.  *Id.* at 10.  Finally, Plaintiff attacks

Defendants' argument regarding her utility allowance, noting that Defendants refer to the

regulation concerning "utility reimbursement," when her claim in fact relates to "utility

allowance."  *Id.* at 11.

**E.     Law Governing Section 1983 Actions**

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress, except that in any action brought
> against a judicial officer for an act or omission taken in such officer's judicial
> capacity, injunctive relief shall not be granted unless a declaratory decree was
> violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S.

42, 48 (1988).  "Individual, non-supervisory defendants may be liable if they knew or reasonably

should have known that their conduct would lead to the deprivation of a plaintiff's constitutional

rights by others, and an unforeseeable intervening act has not terminated their liability."  *Griego*

*v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1208 (D.N.M. 2015) (citing *Martinez v. Carson*,

697 F.3d 1252, 1255 (10th Cir. 2012)).  "Supervisors can be held liable only for their own

unconstitutional or illegal policies, and not for the employees' tortious acts."  *Id.* (citing *Barney*

*v. Pulsipher*, 143 F.3d 1299, 1307-1308 (10th Cir. 1998)).  There is no respondeat superior

liability in § 1983 actions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

**F.      Qualified Immunity Standard**

"Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1026 (10ᵗʰ Cir. 2015) (internal quotation marks and citations omitted).  It also shields against "the burdens of litigation arising from their exercise of discretion." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10ᵗʰ Cir. 2019) (internal quotation marks and citation omitted). "When a defendant raises the qualified-immunity defense, the onus is on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (emphases, internal quotation marks, and citations omitted).  The Court may address either prong first, and both prongs must be met to resist the qualified immunity-defense.  *Id.*

A plaintiff can demonstrate that the law was clearly established at the time of the challenged conduct "by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Quinn v. Young*, 780 F.3d 998, 1005 (10ᵗʰ Cir. 2015) (internal quotation marks and citation omitted).  "Although it is not necessary for the facts in the cited authority to correspond exactly to the situation the plaintiff complains of, the plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10ᵗʰ Cir. 2014) (internal quotation marks and citation omitted). "The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted

14

reasonably in the particular circumstances that he or she faced." *Id.* (internal quotation marks and citation omitted).

## G.    Municipal Liability Standard

"A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Rather, it may only be held liable "for its own unconstitutional or illegal policies." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  To establish municipal liability, the plaintiff is required to demonstrate (1) a municipal custom or policy exists, and (2) a direct causal link between the custom or policy and the plaintiff's alleged injury.  *Id.*; *see also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1319 (10th Cir. 2002) ("It is absolutely necessary to show that the execution of the governments' policy or custom inflicted the injury in order to hold a municipality liable under § 1983." (alterations, omission, internal quotation marks, and citation omitted)).  In addition to these elements, the plaintiff must show that the custom or policy complained of "was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013); *see also George ex rel. Bradshaw v. Beaver Cnty.*, 32 F.4th 1246, 1254 (10th Cir. 2022).

Claims against individuals in their official capacities seek to impose liability on the entity the individuals represent,[6] so official-capacity lawsuits are simply another way of pleading an action against that entity.  *Hinton*, 997 F.2d at 783.  Qualified immunity is only available in suits against officials sued in their personal capacities, not in suits against governmental entities or

---

[6]    Plaintiff styles her claims against Defendants McNeely and Archuleta as brought in their "individual and representative" capacities. Doc. 1-2 at 1.  The Court understands Plaintiff's to plead claims against these Defendants in their individual and official capacities.

those against officials sued in their official capacities. *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009).

**H.    The Law Clearly Establishes that Beneficiaries of Section 8 Housing Assistance Possess a Property Interest Subject to Procedural Due Process Protections**

Plaintiff alleges that Defendants violated her statutory rights under 42 U.S.C. § 1437f and the HUD regulations promulgated thereunder, and her due process rights under the Fourteenth Amendment.  Doc. 1-2 at 7-10.  The Court first discusses whether there is law that clearly established the rights asserted by Plaintiff at the times relevant to this case.

Violations of federal housing laws are actionable under 42 U.S.C. § 1983, and recipients of public assistance, such as Section 8 assistance, have a protected property interest in continuing to receive such assistance.[7]  *See Wright v. Roanoke Redev.. & Hous. Auth.*, 479 U.S. 418, 429-32 (1987); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Chavez v. Hous. Auth.*, 606 F.2d 282, 284, 284 n.5 (10th Cir. 1979) (stating that "[t]enants are . . . entitled to expect continued enjoyment of low[-]cost housing benefits without unwarranted assessments.  This expectation is sufficient to implicate due process protections" and noting that "[o]ther courts have reached the same conclusion in cases dealing with rent increases, eviction, or repair assessments"); *Nozzi v. Hous. Auth.* (*Nozzi II*), 806 F.3d 1178, 1191 (9th Cir. 2015) (holding that there is "a property interest in Section 8 benefits to which the procedural protections of the due process clause apply"); *id.* ("'A person receiving benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.'" (alteration and omission omitted) (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972))); *Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 184 (6th Cir.

---

[7]      At the hearing on the Motions, Defendants conceded that recipients of Section 8 benefits have a protected property interest in those benefits.  Liberty Recording – ABQ-Pecos, 2023-04-27, 2:07:20-2:07:29.

1984); *Holbrook v. Pitt*, 643 F.2d 1261, 1278 (7th Cir. 1981) ("Courts have held in a variety of circumstances that certified tenants in Section 8 programs have protectable property interests under the due process clause."); *Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1002-1003 (4th Cir. 1970), *cert. denied,* 401 U.S. 1003 (1970); *Robinson v. District of Columbia Hous. Auth.*, 660 F. Supp. 2d 6, 20 (D.D.C. 2009) ("There is no debate that the plaintiff's participation in the Section 8 program constitutes a property interest . . . because a participant in the Section 8 program enjoys a property interest in continued occupancy of subsidized housing." (alterations, internal quotation marks, and citation omitted)); *cf. Daniels v. Hous. Auth.*, 940 F. Supp. 2d 248, 259 (D. Md. 2013) (stating that participants in Section 8's Homeownership Option of the HCV program have "a federal right to a properly calculated housing subsidy" under the statute with violations of the right actionable under § 1983), *aff'd*, 505 F. App'x 138 (4th Cir. 2013). Deprivation of a sufficient utility allowance is likewise actionable under § 1983. *Wright*, 479 U.S. at 429-32; *Johnson v. Hous. Auth.*, 442 F.3d 356, 362-63 (5th Cir. 2006).

In cases where Section 8 assistance is at issue, the source of recipients' property interest is the statute and the regulations promulgated under that statute. *See Roth*, 408 U.S. at 577. The regulations contemplate changes to a tenant's circumstances that may change the amount of their Section 8 benefits. 24 C.F.R. § 982.516. But they also contemplate a safeguard to ensure that lower subsidies based on decreased payment standards will not come without adequate notice and time to prepare. Within the applicable regulations is a limiting provision that modulates BCHD's ability to decrease a Section 8 tenant's assistance payment because of decreases in the payments standard. 24 C.F.R. § 982.505(c)(3)(i), (iii). The parties agree about what this provision contemplates, in that it states PHAs, like BCHD, "must provide . . . at least 12 months' notice that the payment standard is being reduced during the term of the HAP contract before the

effective date of the change."  24 C.F.R. § 982.505(c)(3)(iii); *see* Section II.B ¶ 24, *supra*.  The Court will turn to the parties' diverging position about this regulation's applicability to the facts of this case as it becomes relevant to the Court's analysis below, but begins by discussing the individual Defendants' abilities to avail themselves to the qualified-immunity defense.

### 1. Defendant Archuleta Is Entitled to Qualified Immunity

The ability of Defendant Archuleta to avail herself to the qualified-immunity defense is more readily resolved than that of Defendant McNeely, so the Court takes parties' arguments as they relate to the claims against her first.  As noted above, Plaintiff brings Counts 1 and 2 of her Complaint against all Defendants.  Doc. 1-1 at 7, 9.  Plaintiff's theory of liability for Defendant Archuleta appears to be premised on her role as a supervisor.  Doc. 23 at 11.  Defendant Archuleta contends that, as a supervisor, she cannot be held liable in this case because she "did not personally participate in the factual issues and conduct alleged by Plaintiff."  Doc. 20 at 15-16.  Plaintiff has not demonstrated otherwise.

Supervisory liability is properly addressed as part of the qualified-immunity analysis. *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010).  According to the Tenth Circuit, "to establish supervisory liability, a plaintiff must show that an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."  *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000) (alteration, internal quotation marks, and citation omitted).  Moreover, "common to all § 1983 . . . claims is the requirement that liability be predicated on a violation traceable to a defendant-official's 'own individual actions.'"  *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 676).  "This personal-involvement requirement does not mean, however, that direct participation is necessary."  *Id.*

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

*Dodds*, 614 F.3d at 1199. "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010) (internal quotation marks and citation omitted).

It is undisputed that Defendant Archuleta was employed as a Section 8 Housing Support Program Supervisor and did not make or create the policies contained in BCHD Administrative Plans in that role. Doc. 20-3 at 3. So, for a claim against her to be viable, Plaintiff must show something done by Defendant Archuleta that ties her to Plaintiff's alleged constitutional deprivation. Plaintiff has not done so. Nothing before the Court suggests that Defendant Archuleta was personally involved in calculating—or miscalculating, as Plaintiff alleges— Plaintiff's Section 8 assistance payment amount or otherwise demonstrates her personal involvement in this case. The only showing before the Court regarding Defendant Archuleta is her e-mail contact with Plaintiff's counsel, who sought adjustment to the amount of Plaintiff's Section 8 assistance and asserted that it had been underpaid, and that she provided him with paperwork from Plaintiff's file. *Id.* Plaintiff takes the position that Defendant Archuleta, as a supervisor, was required to act following Plaintiff's counsel's contact with her to ensure that BCHD "complied with its obligation to reimburse Plaintiff" for the underpayment of her benefits and that Defendant Archuleta simply failed to act following that contact, aside from providing paperwork to Plaintiff's counsel. Doc. 23 at 11. Specifically, Plaintiff alleges that Defendant Archuleta's actions, or lack thereof, violated the following policy in BCHD's Administrative Plan: "The PHA must reimburse a family for any underpayment of a subsidy, regardless of

19

whether the underpayment was the result of staff-caused error or staff or owner program abuse."

Doc. 22-10 at 3.  The Administrative Plan further provides:

> A subsidy under- or overpayment includes (1) an incorrect housing assistance payment to the owner, (2) an incorrect family share established for the family, and (3) an incorrect utility reimbursement to a family. . . . Whether the incorrect subsidy determination is an overpayment or underpayment of subsidy, the PHA must promptly correct the HAP, family share, and any utility reimbursement prospectively.

*Id.* at 2.  Finally, it states: "PHA-caused incorrect subsidy determinations include (1) failing to correctly apply HCV rules regarding family composition, income, assets, and expenses, (2) assigning the incorrect voucher size to family, and (3) errors in calculation."  *Id.* at 3.

Plaintiff relies heavily on Defendant Archuleta's affirmation that, in response to Plaintiff's counsel's emails to her, she provided paperwork and otherwise "'did not respond.'" Doc. 23 at 11 (quoting Doc. 20-3 at 3).  But the extent of contact between Defendant and Plaintiff's counsel is unclear, and the contents of those e-mails is similarly turbid.[8]  *See Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (stating that, in responding to a motion for summary judgement, litigants may not rely on "speculation" and "must bring to the district court's attention some affirmative indication that [her] version of relevant events is not fanciful"). Defendant Archuleta affirms in her affidavit that Plaintiff's counsel "requested BCHD . . . adjust Plaintiff's subsidy amount" and "asserted in one of those e[-]mails that Plaintiff should be compensated for her subsidy being allegedly 'underpaid' in 2019 and 2020."  Doc. 20-3 at 3. She further affirms that she "did not respond to [Plaintiff's counsel's] assertion."  *Id.*  That Defendant Archuleta did not offer a response directly to Plaintiff's counsel's assertion in his e-mail, as Defendant Archuleta affirms in her affidavit, does not mean that she took no action at

---

[8]     This contact appears to be exclusively emails.  Doc. 20-3 at 3.  While Defendant Archuleta generally references their contents in her affidavit, what exactly Plaintiff's counsel asserted or requested in those emails is unclear.

all; indeed, it is undisputed that she responded to him with paperwork from Plaintiff's file. Under Plaintiff's theory of supervisory liability through inaction, Plaintiff can sustain a claim against Defendant Archuleta by showing that she knew, or should have known, that steps she omitted in her role would cause subordinate employees to deprive Plaintiff of a protected interest. *See Mink*, 613 F.3d at 1001.  Nothing before the Court demonstrates that Defendant Archuleta directed subordinate employees to engage in conduct that deprived Plaintiff of a protected interest.  Simply stated, Plaintiff has presented nothing that indicates that Defendant Archuleta's conduct meets the requisite standard for supervisory liability and escapes the qualified-immunity defense.

In short, Plaintiff's submissions to the Court in response to Defendants' Motion are devoid of any showing that Defendant Archuleta, through action or inaction, brought about a violation of Plaintiff's rights.  For this reason, Defendant Archuleta is entitled to qualified immunity on the claims against her in her individual capacity, Counts 1 and 2, and the Court will enter summary judgment in her favor accordingly.

### 2.     Defendant McNeely Is Not Entitled to Qualified Immunity at This Time

Plaintiff attacks Defendant McNeely's attempt to shield herself with qualified immunity by arguing that Defendant McNeely concedes that the acts she performed were undertaken without any discretion.  Doc. 23 at 12-14.  However, qualified immunity, or lack thereof, for government officials undertaking non-discretionary acts is not as simple as Plaintiff argues. Generally, government officials are entitled to qualified immunity for non-discretionary acts performed in conformity with law or policy.  *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985) (stating that immunity is given for "objectively reasonable reliance on existing law").

Simply put, as long as Defendant McNeely acted in conformity with the regulations and policies at issue here, she cannot be required to answer in damages for violating Plaintiff's rights.

Plaintiff alleges that Defendants applied a payment standard that increased her share of her monthly rent in violation of Section 8, the applicable federal regulations, and BCHD's Administrative Plan. Doc. 1-2 at 7-10. Plaintiff further alleges that, because of Defendants' actions with respect to her monthly rent, she was denied the full benefit of her utility allowance. *Id.* at 9-10. It is the position of Defendant McNeely that she simply acted according to a policy that did not afford her any discretion. Doc. 20 at 14.

As relevant here, the record demonstrates that Plaintiff received two "Assistance Change" letters from Defendant McNeely, one on July 9, 2019, and the other on July 20, 2020. Docs. 20-7; 20-8. The July 9, 2019 Letter states that, effective September 1, 2019, Plaintiff's share of her rent would increase to $224 per month due to annual certification. Doc. 20-7. It further states that any questions may be directed to the Section 8 Office. *Id.* Plaintiff had previously been paying $162.00 per month. *See* Doc. 20-6. The July 20, 2020 Letter states that, effective September 1, 2020, Plaintiff's share of her rent would increase to $226.00 per month due to annual certification. Doc. 20-8. It further states that any questions may be directed to the Section 8 Office. *Id.* At all relevant times, the total contract rent to Plaintiff's landlord remained $714.00. Docs. 20-6; 20-7; 20-8. The payment standard for a one-bedroom unit effective January 1, 2019, was $711.00. Doc. 22-5. The payment standard for a one-bedroom unit effective January 1, 2020, was $713.00. *Id.* Nothing in the record demonstrates that Plaintiff received anything besides these letters to notify her that her share of the monthly rent would increase.

Defendants makes much of the distinction between an *increase* and a *decrease* in the payment standard. They maintain that Plaintiff conflates the two in her claims for relief. Doc. 20 at 18. But the import of this argument is unclear, and the evidence Defendants provide on this point is unilluminating. In Plaintiff's Motion she argues that Defendants McNeely and BCHD deprived her "of part of her property interest in Section 8 benefits" because they applied "a lower payment standard." Doc. 22 at 9. By way of affidavits, Defendants state that at Plaintiff's annual recertifications in 2019 and 2020, her portion of her rent for her Section 8 housing increased, following verification of her income and because of an *increase* in the payment standard. Docs. 20-1 at 4; 20-2 at 3. Defendants fault Plaintiff's reliance on 24 C.F.R. § 982.05(c)(3) because it applies to *decreases* in the payment standards rather than *increases*. Regardless of the technicalities engrained in these terms and the parties' use of them (or misuse, as the case may be), the parties agree that Plaintiff's rent contribution increased at her annual recertifications in both 2019 and 2020. Docs. 20-1 at 4; 20-2 at 3. And, each time, Plaintiff received "Assistance Change," letters informing her of the increase just 54 days and 43 days before such increase was effective, respectively. Docs. 20-7; 20-8. While the total rent to Plaintiff's landlord remained unchanged during this period, Plaintiff's share jumped from $162.00 to $224.00 in 2019, and from $224.00 to $226.00 in 2020. Docs. 20-6; 20-7; 20-8. When placed in proper context, this is hardly a trivial increase. In general terms, the formula for calculating a Section 8 tenant's rent contribution means that a PHA's increase to the payment standard will likely result in a greater subsidy to the tenant. Conversely, a decrease in the payment standard, as Plaintiff alleges occurred here, serves to decrease a tenant's subsidy and can increase the tenant's rent contribution. *See* 42 U.S.C. § 1437f(o); 24 C.F.R. § 982.501 *et*

*seq.*; *see also Nozzi II*, 806 F.3d at 1185.  So, Defendants' argument requires additional, case-specific context.

What appears to have happened here, as expounded upon in the parties' supplemental briefs and discussed at the hearing, is a racheting of sorts with respect to the payment standard. When Plaintiff's tenancy in her housing unit began in 2016, the applicable payment standard was $767.00.  Doc. 22-5 at 1.  Plaintiff paid the gas and electric utilities.  Doc. 20-4 at 2-3.  The payment standard broke down as follows: $714.00 (rent) + $53.00 (utility allowance)[9] = $767.00. Doc. 22-3.  The rent to owner was $714.00.  Doc. 20-4 at 2.  In light of this, when Plaintiff's tenancy began, the contract rent was the maximum possible without the gross rent exceeding the applicable payment standard.  For one year, Plaintiff paid $157.00 (tenant rent to owner), and the HAP was $557.00, for a total of $714.00.  *See* Doc. 41-1.

On July 31, 2018,[10] BCHD sent Plaintiff an "Assistance Change Notice" indicating that her Tenant Rent to Owner would increase to $213.00 and the HAP would be $501.00.  Doc. 20-5.  At that time, the payment standard had decreased to either $716.00 or $707.00.[11]  On August 21, 2018, the HUD New Mexico field office contacted BCHD in August 2018 regarding contact Plaintiff initiated with HUD.  Docs. 20-1 at 3; 42-3 at 2.  Plaintiff had contacted HUD regarding the FMRs and an increase in her portion of the rent for her Section 8 housing.  Docs. 20-1 at 3;

---

[9]      Plaintiff is correct that Defendants conflate "utility allowance" with "utility reimbursement" in their pleadings.  *See* Docs. 27 at 6; 31 at 3; 34 at 2. "Utility reimbursement" is not at issue here.  Docs. 1-2 at 9-10; 34 at 2. Because Plaintiff's utility allowance was used to determine her Section 8 benefits, Docs. 22-3; 22-4; 22-6; 44, and represents a fraction of the payment standard amount, *see, e.g.*, Doc. 22-4, Plaintiff's claim that she did not receive the full benefit of her utility allowance (Count 2) is addressed by the Court's analysis of the application of the payment standards.

[10]      In the interest of completeness, the Court notes here, as it does above, that the applicable payment standard in 2017 was $716.00.  Doc. 22-5 at 1.

[11]      BCHD has not clarified which amount constitutes the payment standard applied to Plaintiff, and it is otherwise unclear from the parties' submissions.

42-3 at 2.  BCHD's records from this time indicate that the decrease in Plaintiff's subsidy was due to a decrease in the FMRs from HUD.  Doc. 42-3 at 2.  One can infer that a decrease in the FMRs would also result in a decreased payment standard, and thus a decrease in Plaintiff's subsidy amount.  *See* 42 U.S.C. § 1437f(o); 24 C.F.R. § 982.501 *et seq.*; *see also Nozzi II*, 806 F.3d at 1185.  Moreover, Plaintiff's gross rent likely would have exceeded the payment standard.  BCHD's records further indicate that BCHD was required to revert Plaintiff's subsidy amount, because it had not given her proper notice of the decrease pursuant to 24 C.F.R. § 982.05(c)(3), and that its Administrative Plan requires immediate correction of errors attributable to BCHD.  Doc. 42-3 at 2.  Finally, the records indicate that BCHD was required to send Plaintiff "written notification . . . that her portion of the rent due would be increasing with her next annual recertification."  *Id.*  Defendants conceded at the hearing that no record of this written notification has been found.  Liberty Recording – ABQ-Pecos, 2023-04-27, 2:57:09-2:58:00.  On August 20, 2018, BCHD sent Plaintiff an "Assistance Change Notice" indicating that it had reversed course, and the Tenant Rent to Owner would be $162.00 and the HAP would be $552.00.  Doc. 20-6.

The applicable payment standard in 2019 was $711.00 ($46.00 lower than when Plaintiff began her tenancy in 2016).  Doc. 22-5 at 1.  On July 9, 2019, BCHD sent Plaintiff an "Assistance Change Letter" indicating that her Tenant Rent to Owner would increase to $224.00 and the HAP would be $490.00.  Doc. 20-7.

The applicable payment standard in 2020[12] was $713.00.  Doc. 22-5 at 1.  On July 20, 2020, BCHD sent Plaintiff an "Assistance Change Letter" indicating that her Tenant Rent to Owner would increase to $226.00 and the HAP would be $488.00.  Doc. 20-8.

---

[12]     The Court's analysis is primarily focused on the events that predate 2020 because, as explained below, it is during this time that the most significant questions concerning the application of a decreased payment standard, and

Two things are of particular significance in this series of events.  First is what occurred in 2018.  As outlined above, BCHD noted that it was erroneous to apply a lower payment standard to Plaintiff because she had not received 12 months' notice of such action, corrected its mistake, and observed that it was required to give Plaintiff 12 months' notice before applying a lower payment standard to Plaintiff in the future.  What happened next is somewhat foggy, and it creates a question of fact.[13]  No record of Plaintiff receiving "a written notification . . . that her portion of the rent due would be increasing with her next annual recertification" can be found, though Defendants' records show she was entitled to that notice.  Doc. 42-3 at 2.  Yet, at Plaintiff's next annual recertification in 2019, her portion of the rent due increased significantly.  BCHD's Administrative Plan adds another layer of ambiguity to this set of circumstances.  The relevant portion of that plan includes the following analysis of the applicable federal regulations:

> If a PHA changes its payment standard schedule, resulting in a lower payment standard amount, during the term of a HAP contract, the PHA is not required to reduce the payment standard used to calculate subsidy for families under HAP contract as long as the HAP contract remains in effect. . . . However, if the PHA does choose to reduce the payment standard for families currently under HAP contract, the initial reduction to the payment standard may not be applied any earlier than the effective date of the family's second regular reexamination following the

---

Defendant McNeely's adherence to the protections attendant thereto, arise.  However, the Court pauses here to note that the record indisputably demonstrates a true increase in the payment standard between 2019 and 2020 without any discrepancy.  This increase goes to the heart of one of the parties' disputes: It is Defendants' position that any increase in the payment standard is not subject to the protections outlined above, i.e., 12 months' notice before Plaintiff's share of her monthly rent increased and/or no reduction in the payment standard used to calculate subsidy for Plaintiff as long as the HAP contract remains in effect, while Plaintiff argues that even if the increased payment standard amount was applied to Plaintiff, it still operates as a decrease from the payment standard applied when Plaintiff's began her tenancy.  As the Court explains, it need not resolve this question today, given the significance of the other issues present and the factual issues engrained therein.  To the extent the parties' diverging positions on the function of the increased payment standard have merit, they can be resolved at another juncture.

[13]     The Court is cognizant that issues concerning questions of material fact, at this stage of its analysis, are germane to Plaintiff's Motion because Defendants' Motion, as it concerns the individual Defendants, is premised on the qualified-immunity defense.  *See Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 758 n.5 (10th Cir. 2021) ("At the summary-judgment phase, a federal court's factual analysis relative to the qualified-immunity question is distinct: the dispositive inquiry of the court is not whether plaintiff (as non-movant) has identified genuine disputes of material fact, but rather whether plaintiff has satisfied his or her two fold burden of (1) demonstrating a violation of a federal constitutional or statutory right, that (2) was clearly established at the time of the alleged violation." (alteration, internal quotation marks, and citation omitted)).

> effective date of the decrease in the payment standard amount. . . . In any case, the
> PHA must provide the family with at least 12 months' notice that the payment
> standard if being reduced before the effective date of the change.

Docs. 22-7 at 2-3; 22-8 at 2-3; 22-9 at 2-3.[14]  The plan then states that the policy of BCHD was

as follows:

> If a PHA changes its payment standard schedule resulting in a lower payment
> standard amount, during the term of a HAP contract, the PHA will not reduce the
> payment standard used to calculate subsidy for families under HAP contract as long
> as the HAP contract remains in effect.

Docs. 22-7 at 3; 22-8 at 3; 22-9 at 3.[15] [16]

During Plaintiff's time renting a housing unit from Mr. Judkins, her landlord, there was a

single HAP Contract between Mr. Jenkins and BCHD, signed on August 10, 2016.  Doc. 20-1 at

2; *see* Doc. 20-4 at 1-3.  On these facts, it seems one of two things happened here.  Either

Plaintiff did not receive the notice to which she was entitled under 24 C.F.R. § 982.05(c)(3), and

BCHD proceeded to decrease her subsidy consistent with a decreased payment standard as

reflected on the "Assistance Change Letter" dated July 9, 2019, or BCHD concluded that it need

not send the notice because, pursuant to its Administrative Plan, it would not apply a decreased

payment standard amount during the term of a HAP contract, but proceeded to, in fact, apply a

decreased payment standard amount.  No other explanation makes sense.  For example,

Defendants claim that the increase in Plaintiff's share of her monthly rent was attributable, at

---

[14]     These citations are to the versions the BCHD Administrative Plan in effect on July 1, 2018, May 14, 2019,
and April 1, 2020, respectively.  The April 1, 2020, version of the plan substitutes "BCHD" for "PHA," but the quoted
language is otherwise unchanged.  *Compare* Docs. 22-7 at 2-3 and 22-8 at 2-3, *with* Doc. 22-9 at 2-3.

[15]     *Supra* note 14.

[16]     The parties disagree about whether the Housing Opportunity Through Modernization Act of 2016
("HOTMA"), Pub. L. No. 114-201, 130 Stat. 782, applies in this case. Docs. 27 at 6-7; 31 at 3-4; 34 at 2-3.  Plaintiff's
discussed HOTMA at the hearing, and Defendants did counter it.  Liberty Recording – ABQ-Pecos, 2023-04-27,
3:14:43-3:16:09.  Regardless, because the provisions of HOTMA that Plaintiff argues apply here appear to track the
policies outline in the relevant versions of BCHD's Administrative Plan, the Court does not resolve this question.
*Compare* Docs. 22-7 at 2-3; 22-8 at 2-3; and 22-9 at 2-3, *with* Doc. 22-12 at 2-4.

least partially, to an increase in her income.  Docs. 20-2 at 3.  Defendants sought to expand upon this point at the hearing and submitted an exhibit consisting of worksheets showing how the total tenant payments, utility allowance, tenant rent, and HAP payments broke down in light of Plaintiff's income.  Doc. 44.  But these worksheets do not support Defendants' position.  The worksheets completed on July 18, 2017, and July 31, 2018, demonstrate that Plaintiff's income increased by $15.00/monthly.  Doc. 44 at 1-2.  When broken down to the total tenant payment, the formula for which is Plaintiff's annual income, less the amount Plaintiff receives in disability income, divided by twelve and then multiplied by 30%, Plaintiff's total tenant payment increased by only $4.00.  *Id.*  This demonstrates that Plaintiff's increased income, alone, is not a plausible explanation for a marked increase in her share of her monthly rent.  Defendants attempt to marry this increase in income to an increase in the payment standards, arguing that these two things, in tandem, explain the sharp increase in Plaintiff's share of her monthly rent.  Doc. 20-2 at 3.  But as explained above, this too does not make sense.

The second thing of particular significance is the uncertainty in the payment standard applicable in 2018.  As noted above, BCHD listed two applicable payment standards for 2018.  The first, $716.00, is listed as being "from BCHD."  The second, $707.00, is listed as being "from HUD."  Doc. 22-5 at 1.  This is noteworthy, because if the higher amount was applied to Plaintiff, then the applicable payment standard in 2019, $711.00, represents a decrease from the previous year, and Plaintiff was therefore entitled to 12 months' notice before she received a reduced subsidy pursuant to 24 C.F.R. § 982.05(c)(3) and subject to the protections in BCHD's Administrative Plan outlined above, which provided that Plaintiff would not be subject to the decreased payment standard.  BCHD has not clarified which amount constitutes the payment standard applied to Plaintiff, and it is otherwise unclear from the parties' submissions.  So, here

too, is a question of fact.[17]  As already stated, it is Defendants' position that any increase in the payment standard is not subject to the protections outlined above, i.e., 12 months' notice before Plaintiff's share of her monthly rent increased and/or no reduction in the payment standard used to calculate subsidy for Plaintiff as long as the HAP contract remains in effect, while Plaintiff argues that even if the increased payment standard amount was applied to Plaintiff, it still operates as a decrease from the payment standard applied when Plaintiff's began her tenancy. The Court need not resolve this question today, however, because at this stage several things are significant: (1) it is disputed Plaintiff received the appropriate notice before her share of her monthly rent increased effective September 1, 2019, but undisputed that BCHD has no record of such notice being sent; (2) it is unclear whether Defendants felt such notice was unnecessary because, pursuant to BCHD's Administrative Plan, a reduced payment standard amount would not be used to calculate subsidy for Plaintiff as long as the HAP contract remains in effect, though they acknowledged 12 months' notice was necessary; and (3) it is unclear which payment standard amount, $716.00 or $707.00, was applied to Plaintiff in 2018, the higher of which would have triggered the 12 months' notice requirement as the 2019 payment standard represents a decrease in the from the previous year.  Each of these things presents a question of material fact precluding the entry of summary judgment.[18] [19]

---

[17]      *Supra* note 13.

[18]      *Supra* note 13.

[19]      For clarity, the Court has distilled the foregoing events into a diagram:

Given this context, the Court must now evaluate Defendant McNeely's role in these events and whether a reasonable official would have understood that her actions violated Plaintiff's rights. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Defendant McNeely was responsible for calculating the amounts reflected on the 2019 and 2020 "Assistance Change" letters which outline decreases in Plaintiff's subsidy amounts. Docs. 20-2 at 3; 20-7; 20-8. Defendant McNeely's position that she was simply following policy is unsupported by the submissions before the Court. To begin, BCHD's records clearly indicate that Plaintiff was entitled to 12 months' notice before her share of the rent increased. Doc. 42-3 at 2. Specifically, these records are BCHD's "Note History" for Plaintiff, which state that BCHD was "required to give [Plaintiff] 12 months['] notice that the FMR[]s were decreasing and that at her next annual recertification she would see an increase in her portion of the rent." Doc. 42-3. This is because lower FMRs result in lower payment standards, and thus an increase to a tenant's rent contribution. This is significant, because these records not only demonstrate that BCHD was



keenly aware of its obligation to Plaintiff, but also that Defendant McNeely had access to them.[20] Yet, as Defendants concede, no record of BCHD sending this required notice can be found. What is perhaps more telling at this early stage of the litigation is that BCHD's Administrative Plan seems to have been given no effect. The issue of notice aside (and whether notice again becomes an issue given the discrepancy in the 2018 payment standard listed by BCHD), lack of compliance with BCHD's Administrative Plan constitutes a violation of the federal regulations, which require BCHD to administer its program in accordance with that plan. 24 C.F.R. § 982.54(a), (c).

It is undisputed that Plaintiff had a right to proper notice and that BCHD was required to follow its Administrative Plan. *See* 24 C.F.R. §§ 982.54(c), 982.505(c)(3)(iii). A reasonable official in Defendant McNeely's shoes would understand that failure to give 12 months' notice to a tenant subject to a substantial decrease in their Section 8 benefits, in which tenants have a protected property interest, due to the application of a decreased payment standard amount, is a violation of a tenant's rights as outlined in 24 C.F.R. § 982.05(c)(3) and BCHD's Administrative Plan. Likewise, a reasonable official in Defendant McNeely's shoes would understand that failure to adhere to BCHD's Administrative Plan—in this case, by decreasing tenant's subsidy during the term of a HAP contract because of a decrease in the payment standard amount— constitutes a violation of that tenant's rights, particularly where, as here, there was a single HAP contract in effect during Plaintiff's tenancy and the change in Plaintiff's share of her monthly rent was so pronounced.

---

[20]     Defendant McNeely contributed to BCHD's "Note History" for Plaintiff after the entry detailing BCHD's obligation to provide Plaintiff 12 months' notice, demonstrating her access to these records. Doc. 42-3 at 2.

For these reasons, the Court concludes that Defendant McNeely is not entitled to

qualified immunity at this time.  Therefore, the claims brought against her in her individual

capacity, Counts 1, 2, and 3,[21] remain active.

I.      **Defendant Bernalillo County (and the Individual Defendants in Their Official
        Capacities) Are Entitled to Summary Judgment on Plaintiff's Municipal Liability
        Claim**

An official policy or custom may take different forms.  *See Cacioppo v. Town of Vail*,

528 F. App'x 929, 931-32 (10th Cir. 2013).  "A challenged practice may be deemed an official

policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a

well-settled custom or practice, a final decision by a municipal policymaker, or deliberately

indifferent training or supervision."  *Schneider*, 717 F.3d at 770.  Plaintiff does not argue that

any formal policy of BCHD is unconstitutional or illegal or that deliberately indifferent training

or supervision is responsible for her alleged harms, and it is undisputed that the individual

Defendants were not policymakers.  Docs. 20-2 at 3; 20-3 at 3.  So, Plaintiff must demonstrate a

pervasive practice with deliberate indifference behind it.  *See Schneider*, 717 F.3d at 770, 771 n.5

("[T]he prevailing state-of-mind standard for a municipality is deliberate indifference regardless

of the nature of the underlying constitution violation."); *see also id.* (noting that while, in the

past, deliberate indifference was the standard applied to municipal liability claims premised on

---

[21]      Given the factual questions identified above, for purposes of Plaintiff's Motion, the Court does not conduct
a full procedural due process analysis under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  *Mathews* directs the
Court to consider

> three distinct factors: First, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the procedures used, and the probable
> value, if any, of additional or substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and administrative burdens that the additional
> or substitute procedural requirement would entail.

*Id.*  The Court has identified factual disputes over whether Plaintiff received the appropriate notice before her share
of her monthly rent increased effective September 1, 2019, and whether she was again entitled to notice given the
discrepancy in the payment standard applied in 2018.  For this reason, the Court finds that engaging in the *Mathews*
balancing test would prove futile now, because the test's second factor—"the procedures used"—cannot perform its
function in light of the factual issues present.  *Id.*  Engaging in the *Mathews* test is for another day, when more
information is before the Court.

training, it "has become the prevailing standard for other types of municipal liability as well. When a § 1983 claimant seeks to impose municipal liability, she must normally show deliberate indifference." (alteration, omission, internal quotation marks, and citation omitted)).  Proving an unlawful custom requires evidence of "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotation marks and citation omitted).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.  In most instances, notice can be established by proving the existence of a pattern of tortious conduct.  In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction.

*Schneider*, 717 F.3d at 771 (alteration and citation omitted).  Plaintiff has not demonstrated a pattern was at play here, and the deliberate indifference standard is unsatisfied.

Plaintiff premises her argument on the individual Defendants' position that they were following applicable policies, which, according to Plaintiff, has caused Defendants to "cede[] the first plank of municipal liability."  Doc. 23 at 5.  Specifically, Plaintiff takes Defendants to mean they "would have done the same thing to any Section 8 tenant who was in . . . Plaintiff's circumstances."  *Id.*  At its core, Plaintiff's argument is that Defendants' failures to adhere to BCHD's Administrative Plan and the applicable federal regulations amounted to a widespread custom or practice so ubiquitous that it bears legal force.  The Court understands this argument to allege a pattern of conduct.  But this allegation, without more, is insufficient to demonstrate that BCHD had notice of such ongoing conduct.  *See George*, 32 F.4th at 1255 (holding that summary judgment was properly granted for the county because a pattern was not established

33

where the plaintiff demonstrated a failure to comply with county policies in her case only). Moreover, just because Defendants, in the course of asserting a qualified-immunity defense, argued that they were following policy, it does not necessarily follow that the conduct giving rise to the claims in this case is rife throughout BCHD.  More to the point, there are three issues here, as detailed extensively above: (1) the contact between Plaintiff's counsel and Defendant Archuleta and Defendant Archuleta's response to that contact; (2) whether Plaintiff received the 12 months' notice to which she was, by Defendants' admission, entitled to prior to her share of the monthly rent increasing in 2019 (and whether such notice was again necessary given the discrepancy in the 2019 payment standard); and (3) whether BCHD was following the policy in its Administrative Plan not to apply a reduced payment standard during the term of the HAP contract.  While the last dispute, on this limited record, does not seem to resolve in Defendants' favor at this time, there is simply nothing before the Court, aside from Plaintiff's reliance on Defendants' averment that they simply followed policy in this case, that demonstrates this conduct occurred outside of the instant case.  Plaintiff has not put forth any facts regarding officials at BCHD.  In short, Plaintiff cannot rest on Defendants' statement alone.

In the absence of a pattern of conduct, Plaintiff must show that a violation of her rights was a highly predictable or plainly obvious consequence of BCHD's action or lack thereof.  The actions of the individual Defendants here as alleged by Plaintiff are as follows: (1) Defendant Archuleta had contact from Plaintiff's counsel asserting that Plaintiff should be compensated for subsidy underpayment in 2019 and 2020 and failed to act, in violation of BCHD's Administrative Plan; and (2) Defendant McNeely failed to follow the federal regulations and the BCHD Administrative Plan, as outlined extensively above.  In this respect, Plaintiff's arguments also fall short.

Again, Plaintiff has not put forth any facts regarding officials at BCHD, and nothing before the Court indicates that a violation of Plaintiff's federal rights was a plainly obvious consequence of BCHD's actions or inactions.  Defendant Archuleta was contacted by Plaintiff's counsel requesting compensation for subsidy underpayment to Plaintiff in 2019 and 2020 and adjustment to her subsidy amount.  Defendant Archuleta responded with documents from Plaintiff's file.  Nothing in this course of events so obviously demonstrates that intervention was needed to prevent a violation of Plaintiff's federal rights.  The same is true for Defendant McNeely's conduct—the facts alleged do not permit an inference that the risk of violations of federal rights were very predictable or exceedingly obvious.  To the extent Plaintiff's claims can be read to allege that BCHD's inaction substitutes for a pattern of conduct, she "must show that the need to act is so obvious that the [municipality]'s conscious decision not to act can be said to amount to a policy of deliberate indifference to [the plaintiff's] constitutional rights." *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6ᵗʰ Cir. 2005); *see also Garcia v. Casuas*, No. 11-CV-11, 2011 WL 7444745, at *27 (D.N.M. Dec. 8, 2011).  Plaintiff has not demonstrated that BCHD made a conscious decision not to act.

For these reasons, there are no disputes of material fact concerning Plaintiff's municipal liability claims, Counts 1, 2, and 3, brought against Defendant Bernalillo County and Defendants Archuleta and McNeely in their official capacities.  Therefore, the Court will enter summary judgment in Defendants' favor as to these claims.

### III. CONCLUSION

Defendants' Motion is **GRANTED IN PART AND DENIED IN PART** as follows:

Defendant Archuleta is entitled to qualified immunity, and summary judgment is thereby entered in her favor as to the claims against her in her individual capacity (Counts 1 and 2);

Defendant McNeely is not entitled to qualified immunity at this time and therefore the claims brought against her in her individual capacity remain active (Counts 1, 2, and 3); and

Summary judgment is entered in Defendants' favor as to the municipal liability claims. (Counts 1, 2, and 3).

Plaintiff's Motion is **DENIED** because there exist disputes of material fact as to the claims against Defendant McNeely in her individual capacity (Counts 1, 2, and 3).

**IT IS SO ORDERED.**

**JOHN F. ROBBENHAAR**
United States Magistrate Judge,
Presiding by Consent